**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMANDA BEEZLEY, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiff, <br><br> vs. <br><br> FENIX PARTS, INC., KENT ROBERTSON, and SCOTT PETTIT, <br><br> Defendants. | **Civil Action No.:** <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Amanda Beezley ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fenix Parts, Inc. ("Fenix" or the "Company"), and information readily obtainable on

1

the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Fenix between May 14, 2015 and October 12, 2016, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). The Company maintains an office in this judicial district, and a significant portion of Defendants' actions, and the subsequent damages, took place in this judicial district.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Fenix securities at artificially inflated prices during the Class Period and was economically damaged thereby.

7.     Defendant Fenix is incorporated in Delaware and headquartered in Westchester, Illinois. Defendants maintain an office in Rahway, New Jersey. Fenix owns full service and self service recycling yards throughout the USA and Canada. Fenix recycles and resells original equipment manufacturer ("OEM") automotive products. The Company's primary business is auto recycling, which is the recovery and resale of OEM parts, components and systems reclaimed from damaged, totaled or low value vehicles. Customers include collision repair shops (body shops), mechanical repair shops, auto dealerships and individual retail customers. Fenix securities trade on NASDAQ under the ticker "FENX."

8.     Defendant Kent Robertson ("Robertson") has been the Company's Chief Executive Officer ("CEO") and President throughout the Class Period.

9.     Defendant Scott Pettit ("Pettit") has been the Company's Chief Financial Officer throughout the Class Period.

10.     Defendants Robertson and Pettit are collectively referred to herein as the "Individual Defendants."

11.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

12.     Fenix is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Fenix under *respondeat superior* and agency principles.

14.     Defendants Fenix and Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

15.     Fenix was founded in January 2014 to combine eight companies and to create a network that offers sales, fulfillment and distribution in key regional markets in the United States and Canada.

**Materially False and Misleading**
**Statements Issued During the Class Period**

16.     On May 13, 2015, the SEC declared Fenix's Registration Statement and Prospectus

(the "Offering Documents") effective and Fenix securities began trading on NASDAQ on May 14,

2015.

17.     The Offering Documents discussed the Company's accounting policies pertaining to

inventory, stating in relevant part:

**Critical Accounting Policies and Estimates**
The discussion and analysis of our financial condition and results of operations are
based upon our financial statements, which have been prepared in accordance with
accounting principles generally accepted in the United States. The preparation of
these financial statements requires us to make estimates, assumptions, and judgments
that affect the reported amounts of assets, liabilities, revenue and expenses, and
related disclosure of contingent assets and liabilities. On an ongoing basis, we
evaluate our estimates, assumptions, and judgments, including those related to
revenue recognition, inventory valuation, business combinations, and goodwill
impairment. We base our estimates on historical experience and on various other
assumptions that we believe are reasonable under the circumstances. The results of
these estimates form the basis for our judgments about the carrying values of assets
and liabilities and our recognition of revenue. Actual results may differ from these
estimates.

*                *                *

*Inventories*
Our recycled OEM and related product inventory cost is established based upon the
price we pay for a vehicle, including auction, storage and towing fees, as well as
expenditures for buying and dismantling vehicles. After dismantling, the cost
assigned to salvaged parts and scrap is determined using the average cost to sales
percentage at each of our facilities and applying that percentage to the facility's
inventory at expected selling prices. The average cost to sales percentage is derived
from each facility's historical vehicle profitability for salvage vehicles purchased at
auction or from contracted rates for salvage vehicles acquired under certain direct
procurement arrangements.

For all inventories, carrying value is recorded at the lower of cost or market and is
reduced to reflect the age of the inventory and current anticipated demand. If actual
demand differs from our estimates, additional reductions to inventory carrying value
would be necessary in the period such determination is made.

5

18.     The Offering Documents also discussed the Company's assessment of goodwill impairment, stating in relevant part:

### Goodwill Impairment

We are required to assess our goodwill for impairment at least annually for each reporting unit that carries goodwill. We may elect to first do a qualitative assessment to determine whether it is more likely than not that a reporting unit's fair value is in excess of its carrying value. If not, or if we elect to not perform a qualitative assessment, we then perform a quantitative impairment test. The first step of the quantitative test includes us estimating the fair value of the reporting unit and comparing that estimated fair value to the reporting unit's carrying value. If fair value exceeds carrying value, then no impairment is deemed to exist. Otherwise, we proceed to the second step and use that estimated fair value as a hypothetical purchase price for the reporting unit to determine the resulting "implied" goodwill (computed similarly to how goodwill is computed under acquisition accounting described above). An excess of a reporting unit's recorded goodwill over its "implied" goodwill is reported as an impairment charge. We perform goodwill impairment tests annually in the fourth quarter and between annual tests whenever events or circumstances indicate that an impairment may exist. We are required to evaluate events and circumstances that may affect the performance of the reporting unit and the extent to which the events and circumstances may impact the future cash flows of the reporting unit.

Our reporting unit fair value estimates are established using weightings of the results of a discounted cash flow methodology and a comparative market multiples approach. We believe that using two methods to determine fair value limits the chances of an unrepresentative valuation. Nonetheless, these valuations are subject to significant subjectivity and assumptions, including estimates of future sales growth rates, gross margin patterns, changes in operating expenses, terminal values, discount rates and comparable companies. Changes in such assumptions or estimates may require us to record goodwill impairment charges.

19.     On June 29, 2015, the Company filed a Form 10-Q for the quarter ending March 31, 2015 (the "1Q15 10-Q") with the SEC. The 1Q15 10-Q was signed by Defendants Robertson and Pettit. Attached to the 1Q15 10-Q were certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX") signed by Defendants Robertson and Pettit attesting to the accuracy of the financial statements and that all fraud was disclosed.

20.     The 1Q15 10-Q discussed the Company's accounting policies pertaining to inventory, stating in relevant part:

**Critical Accounting Policies and Estimates**

Our discussion and analysis of our financial condition and results of operations are based upon both the individual consolidated or combined financial statements of Fenix Parts, Inc. (prior to the IPO and Combinations) and the co-predecessors, as well as a discussion of the pro forma results of operations for the Company as if the Combinations had taken place on January 1, 2014, all of which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires us to make estimates, assumptions and judgments that affect the reported amounts of assets, liabilities, revenue and expenses and related disclosure of contingent assets and liabilities. On an on going basis, we evaluate our estimates, assumptions and judgments including those related to revenue recognition, warranty costs, inventory valuation, allowance for doubtful accounts, goodwill impairments, self-insurance programs, contingencies, asset impairments and taxes. We base our estimates on historical experience and on various other assumptions that we believe are reasonable under the circumstances. The results of these estimates form the basis for our judgments about the carrying values of assets and liabilities and our recognition of revenue that is not readily apparent from other sources. Actual results may differ from these estimates.

*        *        *

*Inventory Accounting*

Our recycled OEM and related product inventory cost is established based upon the price we pay for a vehicle, including auction, storage and towing fees, as well as expenditures for buying and dismantling vehicles. After dismantling, the cost assigned to salvaged parts and scrap is determined using the average cost to sales percentage at each of our facilities and applying that percentage to the facility's inventory at expected selling prices. The average cost to sales percentage is derived from each facility's historical vehicle profitability for salvage vehicles purchased at auction or from contracted rates for salvage vehicles acquired under certain direct procurement arrangements.

For all inventories, carrying value is recorded at the lower of cost or market and is reduced to reflect the age of the inventory and current anticipated demand. If actual demand differs from our estimates, additional reductions to inventory carrying value would be necessary in the period such determination is made.

21.     The 1Q15 10-Q also discussed the Company's assessment of goodwill impairment, stating in relevant part:

*Goodwill Impairment*

We are required to assess our goodwill for impairment at least annually for each reporting unit that carries goodwill. We may elect to first perform a qualitative assessment to determine whether it is more likely than not that a reporting unit's fair value is in excess of its carrying value. If not, or if we elect to not perform a qualitative assessment, we then perform a quantitative impairment test. The first step of the quantitative test includes us estimating the fair value of the reporting unit and comparing that estimated fair value to the reporting unit's carrying value. If fair value exceeds carrying value, then no impairment is deemed to exist. Otherwise, we proceed to the second step and use that estimated fair value as a hypothetical purchase price for the reporting unit to determine the resulting "implied" goodwill (computed similarly to how goodwill is computed under acquisition accounting described above). An excess of a reporting unit's recorded goodwill over its "implied" goodwill is reported as an impairment charge. We perform goodwill impairment tests annually in the fourth quarter and between annual tests whenever events or circumstances indicate that an impairment may exist. We are required to evaluate events and circumstances that may affect the performance of the reporting unit and the extent to which the events and circumstances may impact the future cash flows of the reporting unit.

Our reporting unit fair value estimates are established using weightings of the results of a discounted cash flow methodology and a comparative market multiples approach. We believe that using two methods to determine fair value limits the chances of an unrepresentative valuation. Nonetheless, these valuations are subject to significant subjectivity and assumptions, including estimates of future sales growth rates, gross margin patterns, changes in operating expenses, terminal values, discount rates and comparable companies. Changes in such assumptions or estimates may require us to record goodwill impairment charges

22. The statements contained in ¶¶ 17-21 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company had an inadequate inventory valuation methodology; (2) the Company had an inadequate methodology to calculate goodwill impairment; (3) the Company was engaging and/or had engaged in conduct that would result in an SEC investigation; and (4) as a result, Defendants'

statements about the Company's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Slowly Emerges**

23.     On September 10, 2015, *Street Sweeper* published the article, "Fenix Parts: This Automobile Parts Seller Could Be Headed To The Junkyard." The article discussed some of the problems at Fenix including its messy financials and lack of adequate inventory valuation methodologies, stating in relevant part:

> **Messy Financials** - Fenix is also challenged by messy financials, apparent inability to file financial reports on time and a Nasdaq deficiency notice.
>
> *              *              *
>
> **\*Frequently Delayed Financial Report Raises Issues, Builds NASDAQ Deficiency Notice Pressure**
>
> But cash-poor publicly traded companies are expected to file their financials on time, too. The second quarter financials were due Aug. 14.
>
> Fenix didn't make it. So Nasdaq notified the company of its short-coming on Aug. 20. Four business days later, Fenix notified investors about the Nasdaq deficiency notice, stating it would file its financials on Sept. 2.
>
> But in a filing dated Sept. 2, Fenix states:
>
> "On September 2, 2015, the Company issued a press release reporting its second quarter 2015 pro forma consolidated revenues and providing an update on its second quarter Form 10-Q filing, which is now expected within the next two business days."
>
> What happened two days later, on Sept. 4? Nothing.
>
> Fenix did hold a Sept. 3 "investor update" in which CEO Kent Robertson said, "…we are close to completing our second-quarter 10-Q filing. This filing is complex …"
>
> This filing issue is yet another chapter in Fenix's history of complex, incomplete financial details that managers must repeatedly apologize for in conference calls.

The company did recently tell investors to expect a loss for the second quarter. But how bad?

The clock is ticking. Investors are wondering.

24.     On this news, shares of Fenix securities declined $1.12 per share or approximately 11.7% from its previous closing price on unusually heavy volume to close at $8.47 per share on September 10, 2015, damaging investors.

25.     On September 14, 2015, the Company filed a Form 10-Q for the quarter ending June 30, 2015 (the "2Q15 10-Q") with the SEC. The 2Q15 10-Q was signed by Defendants Robertson and Pettit. Attached to the 2Q15 10-Q were SOX certifications signed by Defendants Robertson and Pettit attesting to the accuracy of the financial statements and that all fraud was disclosed.

26.     The 2Q15 10-Q discussed the Company's accounting policies pertaining to inventory, stating in relevant part:

> **Critical Accounting Policies and Estimates**
> Our discussion and analysis of our financial condition and results of operations are based upon both the individual consolidated or combined financial statements of Fenix Parts, Inc. (prior to the IPO and Combinations) and the co-predecessors, as well as a discussion of the actual results of operations since the Combinations and certain pro forma results of operations for the Company as if the Combinations and IPO had taken place on January 1, 2014, all of which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires us to make estimates, assumptions and judgments that affect the reported amounts of assets, liabilities, revenue and expenses and related disclosure of contingent assets and liabilities. On an on going basis, we evaluate our estimates, assumptions and judgments including those related to revenue recognition, warranty costs, inventory valuation, allowance for doubtful accounts, goodwill impairments, self-insurance programs, contingencies, asset impairments and taxes. We base our estimates on historical experience and on various other assumptions that we believe are reasonable under the circumstances. The results of these estimates form the basis for our judgments about the carrying values of assets and liabilities and our recognition of revenue that is not readily apparent from other sources. Actual results may differ from these estimates.

*     *     *

### *Inventory Accounting*

Our recycled OEM and related product inventory cost is established based upon the price we pay for a vehicle, including auction, storage and towing fees, as well as expenditures for buying and dismantling vehicles. After dismantling, the cost assigned to salvaged parts and scrap is determined using the average cost to sales percentage at each of our facilities and applying that percentage to the facility's inventory at expected selling prices. The average cost to sales percentage is derived from each facility's historical vehicle profitability for salvage vehicles purchased at auction or from contracted rates for salvage vehicles acquired under certain direct procurement arrangements.

For all inventories, carrying value is recorded at the lower of cost or market and is reduced to reflect the age of the inventory and current anticipated demand. If actual demand differs from our estimates, additional reductions to inventory carrying value would be necessary in the period such determination is made.

27.     The 2Q15 10-Q also discussed the Company's assessment of goodwill impairment,

stating in relevant part:

### Goodwill Impairment

We are required to assess our goodwill for impairment at least annually for each reporting unit that carries goodwill. We may elect to first perform a qualitative assessment to determine whether it is more likely than not that a reporting unit's fair value is in excess of its carrying value. If not, or if we elect to not perform a qualitative assessment, we then perform a quantitative impairment test. The first step of the quantitative test includes us estimating the fair value of the reporting unit and comparing that estimated fair value to the reporting unit's carrying value. If fair value exceeds carrying value, then no impairment is deemed to exist. Otherwise, we proceed to the second step and use that estimated fair value as a hypothetical purchase price for the reporting unit to determine the resulting "implied" goodwill (computed similarly to how goodwill is computed under acquisition accounting described above). An excess of a reporting unit's recorded goodwill over its "implied" goodwill is reported as an impairment charge. We perform goodwill impairment tests annually in the fourth quarter and between annual tests whenever events or circumstances indicate that an impairment may exist. We are required to evaluate events and circumstances that may affect the performance of the reporting unit and the extent to which the events and circumstances may impact the future cash flows of the reporting unit.

Our reporting unit fair value estimates are established using weightings of the results of a discounted cash flow methodology and a comparative market multiples approach. We believe that using two methods to determine fair value limits the chances of an unrepresentative valuation. Nonetheless, these valuations are subject to significant subjectivity and assumptions, including estimates of future sales growth

rates, gross margin patterns, changes in operating expenses, terminal values, discount rates and comparable companies. Changes in such assumptions or estimates may require us to record goodwill impairment charges.

28.     On November 17, 2015, the Company filed a Form 10-Q for the quarter ending September 30, 2015 (the "3Q15 10-Q") with the SEC. The 3Q15 10-Q was signed by Defendants Robertson and Pettit. Attached to the 3Q15 10-Q were SOX certifications signed by Defendants Robertson and Pettit attesting to the accuracy of the financial statements and that all fraud was disclosed.

29.     The 3Q15 10-Q discussed the Company's accounting policies pertaining to inventory, stating in relevant part:

> **Critical Accounting Policies and Estimates**
> Our discussion and analysis of our financial condition and results of operations are based upon both the individual consolidated or combined financial statements of Fenix Parts, Inc. (prior to the IPO and Combinations) and the co-predecessors, as well as a discussion of the actual results of operations since the Combinations and certain pro forma results of operations for the Company as if the Combinations and IPO had taken place on January 1, 2014, all of which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires us to make estimates, assumptions and judgments that affect the reported amounts of assets, liabilities, revenue and expenses and related disclosure of contingent assets and liabilities. On an on going basis, we evaluate our estimates, assumptions and judgments including those related to revenue recognition, warranty costs, inventory valuation, allowance for doubtful accounts, goodwill impairments, self-insurance programs, contingencies, asset impairments and taxes. We base our estimates on historical experience and on various other assumptions that we believe are reasonable under the circumstances. The results of these estimates form the basis for our judgments about the carrying values of assets and liabilities and our recognition of revenue that is not readily apparent from other sources. Actual results may differ from these estimates.
>
>                         *          *          *
>
> *Inventory Accounting*
> Our recycled OEM and related product inventory cost is established based upon the price we pay for a vehicle, including auction, storage and towing fees, as well as expenditures for buying and dismantling vehicles. After dismantling, the cost assigned to salvaged parts and scrap is determined using the average cost to sales

percentage at each of our facilities and applying that percentage to the facility's inventory at expected selling prices. The average cost to sales percentage is derived from each facility's historical vehicle profitability for salvage vehicles purchased at auction or from contracted rates for salvage vehicles acquired under certain direct procurement arrangements.

For all inventories, carrying value is recorded at the lower of cost or market and is reduced to reflect the age of the inventory and current anticipated demand. If actual demand is less than our estimates, additional reductions to inventory carrying value would be necessary in the period such determination is made.

Inventories acquired in business combinations are marked up from historical cost to an estimate of fair market value as described below. This mark up increases reported cost of goods sold and reduces gross margin in the initial months following an acquisition.

30.     The 3Q15 10-Q also discussed the Company's assessment for goodwill impairment,

stating in relevant part:

> ### Goodwill Impairment
> We are required to assess our goodwill for impairment at least annually for each reporting unit that carries goodwill. We may elect to first perform a qualitative assessment to determine whether it is more likely than not that a reporting unit's fair value is in excess of its carrying value. If not, or if we elect to not perform a qualitative assessment, we then perform a quantitative impairment test. The first step of the quantitative test includes us estimating the fair value of the reporting unit and comparing that estimated fair value to the reporting unit's carrying value. If fair value exceeds carrying value, then no impairment is deemed to exist. Otherwise, we proceed to the second step and use that estimated fair value as a hypothetical purchase price for the reporting unit to determine the resulting "implied" goodwill (computed similarly to how goodwill is computed under acquisition accounting described above). An excess of a reporting unit's recorded goodwill over its "implied" goodwill is reported as an impairment charge. We perform goodwill impairment tests annually in the fourth quarter and between annual tests whenever events or circumstances indicate that an impairment may exist. We are required to evaluate events and circumstances that may affect the performance of the reporting unit and the extent to which the events and circumstances may impact the future cash flows of the reporting unit.
>
> Our reporting unit fair value estimates are established using weightings of the results of a discounted cash flow methodology and a comparative market multiples approach. We believe that using two methods to determine fair value limits the chances of an unrepresentative valuation. Nonetheless, these valuations are subject to significant subjectivity and assumptions, including estimates of future sales growth

13

rates, gross margin patterns, changes in operating expenses, terminal values, discount rates and comparable companies. Changes in such assumptions or estimates may require us to record goodwill impairment charges.

31.     On April 14, 2016, the Company filed a Form 10-K for the year ending December 31, 2015 (the "2015 10-K") with the SEC. The 2015 10-K was signed by Defendants Robertson and Pettit. Attached to the 2015 10-K were SOX certifications signed by Defendants Robertson and Pettit attesting to the accuracy of the financial statements and that all fraud was disclosed.

32.     The 2015 10-K discussed the Company's accounting policies pertaining to inventory, stating in relevant part:

**Critical Accounting Policies and Estimates**
The consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America, which require us to make estimates and assumptions especially as it relates to Revenue Recognition, Allowance for Doubtful Accounts, Inventories, Business Combinations, Goodwill, Intangible Assets, and Contingent Consideration. We believe that the following accounting policies (see Note 2, Summary of Significant Accounting Policies, to the consolidated financial statements in this document) involve a higher degree of judgment and complexity and are deemed critical. We discuss our critical accounting policies with the Audit Committee and the Board of Directors.

*       *       *

*Inventories*
Our recycled OEM and related product inventory cost is established based upon the price we pay for a vehicle, including auction, storage and towing fees, as well as expenditures for buying and dismantling vehicles. After dismantling, the cost assigned to salvaged parts and scrap is determined using the average cost to sales percentage at each facility and applying that percentage to the facility's inventory at expected selling prices. The average cost to sales percentage is derived from each facility's historical vehicle profitability for salvage vehicles purchased at auction or acquired under other arrangements.

All inventory is recorded at the lower of cost or market. The market value of our inventory is determined based on the nature of the inventory and anticipated demand. If actual demand differs from our earlier estimates, reductions to inventory carrying value would be necessary in the period such determination is made.

The historical cost basis of inventories acquired in conjunction with all business combinations includes an adjustment to record the inventory at its fair value on the date of acquisition. This incremental adjustment of inventory to fair value is amortized through cost of goods sold based on the average utilization of the acquired inventory. The acquisitions of the Subsidiaries contributed a $10.0 million increase in our recycled OEM and related products inventory during 2015, of which, approximately $8.6 million was amortized through cost of goods sold. As of December 31, 2015, the unamortized fair value inventory adjustment is approximately $1.4 million. See Note 3, Business Combinations, to the consolidated financial statements in this document for further information on our acquired inventory.

33.     The 2015 10-K also discussed the Company's assessment of goodwill impairment,

stating in relevant part:

### *Assessment of Potential Impairments of Goodwill*
We are required to assess our goodwill for impairment at least annually for our one reporting unit. We may elect to first do a qualitative assessment to determine whether it is more likely than not that our reporting unit's fair value is in excess of its carrying value. If not, or if we elect to not perform a qualitative assessment, we then perform a quantitative impairment test. The first step of the quantitative test includes estimating the fair value of the reporting unit and comparing that estimated fair value to the reporting unit's carrying value. If fair value exceeds carrying value, then no impairment is deemed to exist. Otherwise, we proceed to the second step and use that estimated fair value as a hypothetical purchase price for the reporting unit to determine the resulting "implied" goodwill (computed similarly to how goodwill is computed under acquisition accounting described above). An excess of a reporting unit's recorded goodwill over its "implied" goodwill is reported as an impairment charge. We performed our initial goodwill impairment test in the fourth quarter of fiscal year 2015 and will perform between annual tests whenever events or circumstances indicate that an impairment may exist. We are required to evaluate events and circumstances that may affect the performance of the reporting unit and the extent to which the events and circumstances may impact the future cash flows of the reporting unit.

Our reporting unit fair value estimates are established using weightings of the results of a discounted cash flow methodology and our market capitalization. We believe that using two methods to determine fair value limits the chances of an unrepresentative valuation. Nonetheless, these valuations are subject to significant subjectivity and assumptions, including estimates of future sales growth rates, gross margin patterns, changes in operating expenses, terminal values, discount rates and comparable companies. Changes in such assumptions or estimates may require us to record goodwill impairment charges. We completed our annual goodwill impairment review as of October 1, 2015, which was before the acquisitions of Tri-City and

Butler, using our forecasted plan. Since Fenix operates in just one operating segment and one reporting unit, Auto Recycling, all the recorded goodwill is considered attributable to that reporting unit and impairment is tested accordingly.

We determined that it was necessary to perform a quantitative assessment of our goodwill for the purpose of determining whether a goodwill impairment existed at October 1, 2015. When conducting this analysis, we identified the three steps below as integral to our analysis.

1.        We engaged third party valuation experts with a detailed understanding of our automotive recycling business, to perform a valuation. The fair value was defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at October 1, 2015.

2.        In our disaggregated forecast, we evaluated whether the financial performance realized in 2015 was a result of discrete matters that are considered highly unlikely to recur in the future or whether the matters were systemic in nature that might result in a downturn of the business.

3.        We prepared a discounted cash flow analysis over a five year period so as to derive a reasonable view of the cash flows that the business would generate from 2016-2020.

Inherent in our analysis is the reliance on key assumptions, including, but not limited to, the cash flows of the reporting unit, weighted average cost of capital ("WACC"), and terminal growth rates of the Company. In evaluating the key variables, we concluded our WACC and terminal growth rates were approximately 10% and 3%, respectively. With all other assumptions remaining constant, to the extent that either the WACC increases by 1.0% or the terminal growth rate decreases by 0.5%, proceeding to step 2 of the impairment analysis, as indicated in ASC Topic 350, Intangibles - Goodwill and Other, would be necessary.

As part of our annual budget process and in light of the operating losses incurred in 2015, management prepared its 2016 forecast and provided a long-term prospective view of the various locations, which provided insight into the future growth assumptions for the business. To the extent that there is volatility in our stock price, a significant economic downturn, further reduction in scrap prices, further reduction in the Canadian exchange rate, variation in vehicle accident rates, change in state and federal laws, significant increases in vehicle procurement costs or changes in other variables that can materially impact our business, we may need to evaluate goodwill for impairment in between the annual measurement period if events and circumstances indicate that it is more likely than not the asset is impaired.

As a result of the quantitative analysis, where the fair value was computed, it was

calculated that the fair value of our business exceeded the carrying value of goodwill on the balance sheet by approximately 8.5%. We will continue to monitor the actual results of our operations against our long-term plan and re-evaluate goodwill as required in between the annual measurement period if events and circumstances indicate that it is more likely than not the asset is impaired. The determination of fair value is highly sensitive to differences between estimated and actual cash flows and changes in the related discount rate used to evaluate the fair value of the reporting unit where the goodwill resides. Based on the discounted cash flow valuation at October 1, 2015, a 1% increase in the WACC, terminal growth rate decrease by 0.5%, shortfall against budgeted revenue and gross profit in excess of 2% or changes in other significant variables in the future could potentially result in impairment.

We also consider current market capitalization compared to the sum of the estimated fair values of our business in conjunction with each impairment assessment. As part of this consideration, management recognizes that our market capitalization may not be an accurate representation of our fair value for the following reasons:

-         The long term horizon of the valuation process versus a short term valuation using current market conditions; and
-         Control premiums reflected in the reporting unit fair values but not in our stock price.

As of the October 1, 2015 valuation date, the fair value of our reporting unit was approximately $157.0 million, which was derived using the income approach and our market capitalization. Since this amount was greater than carrying value, management concluded that the recorded goodwill is not impaired.

Further, there were no qualitative events or indicators through December 31, 2015 that supported changing our conclusion as of December 31, 2015.

34.       On June 29, 2016, the Company filed a Form 10-Q for the quarter ending March 31, 2016 (the "1Q16 10-Q") with the SEC. The 1Q16 10-Q was signed by Defendants Robertson and Pettit. Attached to the 1Q16 10-Q were SOX certifications signed by Defendants Robertson and Pettit attesting to the accuracy of the financial statements and that all fraud was disclosed.

35.       The 1Q16 10-Q discussed the Company's critical accounting policies, stating in relevant part:

**Critical Accounting Policies and Estimates**

Our accounting policies require us to apply methodologies, estimates and judgments that have a significant impact on the results we report in our consolidated financial statements. In our 2015 Annual Report on Form 10-K, we discussed those material policies that we believe are critical and require the use of complex judgment in application. There have been no changes to our critical accounting policies since that time.

36. The 1Q16 10-Q also discussed the Company's assessment of goodwill impairment, stating in relevant part:

*Goodwill Impairment*
Based on the result of the first step of the goodwill impairment analysis, we determined that the fair value of our reporting unit was less than its carrying value as of March 31, 2016 and, as such, we applied the second step of the goodwill impairment test. Based on the result of this second step of the goodwill impairment analysis, we recorded a $43.3 million non-cash pretax charge to reduce the carrying value of goodwill.

37. The statements contained in ¶¶ 25-36 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company had an inadequate inventory valuation methodology; (2) the Company had an inadequate methodology to calculate goodwill impairment; (3) the Company was engaging and/or had engaged in conduct that would result in an SEC investigation; and (4) as a result, Defendants' statements about the Company's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

38. On October 13, 2016, the Company issued a press release entitled, "Fenix Parts Announces Preliminary Second Quarter 2016 Revenue and Provides Update Regarding Second Quarter Form 10-Q Filing Status." The Company revealed that it was still not able to file its quarterly report for the second quarter of 2016 and it received subpoena from the SEC, stating in relevant part:

18

The Company has delayed filing its Quarterly Report on Form 10-Q for the second quarter of 2016 to complete quarterly review and first-time-through procedures, which are still ongoing. ***The delay has been, in large part, caused by the complexity of accounting for the Company's*** multiple business combinations, the coordination of the transition of responsibilities between the Company's prior and new independent registered public accounting firms, and additional procedures on purchase accounting and ***inventory following the Company's recent receipt of a subpoena from the Chicago Regional Office of the SEC requiring the production of various documents. The SEC inquiry appears to be focused on the Company's recent change in its independent registered public accounting firm, its previously announced business combinations and related goodwill impairment charge, the effectiveness of its internal control over financial reporting and its inventory valuation methodology.*** The Company's receipt of a subpoena from the SEC does not mean that it has violated the securities laws, and management does not believe that the inquiry will have a material impact on the Company's financial condition, results of operations or cash flow, but cannot predict the duration or outcome of the inquiry.

(Emphasis added).

39.     On this news, shares of Fenix declined $0.45 per share or approximately 11.6% from its previous closing price on unusually heavy volume to close at $3.42 per share on October 13, 2016, further damaging investors.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Fenix securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Fenix, members of the Individual Defendants' and Underwriter Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

41.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Fenix securities were actively traded on NASDAQ.

While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

42.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

43.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business Fenix;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Fenix to issue false and misleading SEC filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and SEC filing

- whether the prices of Fenix's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

20

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

46.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Fenix shares met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient and automated market;

- As a public issuer, Fenix filed periodic public reports with the SEC and NASDAQ;

- Fenix regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- Fenix was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

47.     Based on the foregoing, the market for Fenix securities promptly digested current information regarding Fenix from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

48.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United*

*States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
Against All Defendants**

49.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

51.      During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

52.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Fenix securities during the Class Period.

53.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Fenix were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and

knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Fenix, their control over, and/or receipt and/or modification of Fenix's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Fenix, participated in the fraudulent scheme alleged herein.

54.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Fenix personnel to members of the investing public, including Plaintiff and the Class.

55.     As a result of the foregoing, the market price of Fenix securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Fenix securities during the Class Period in purchasing Fenix securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

56.     Had Plaintiff and the other members of the Class been aware that the market price of Fenix securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Fenix securities at the artificially inflated prices that they did, or at all.

57.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

58.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Fenix securities during the Class Period.

### COUNT II

**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

59.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

60.     During the Class Period, the Individual Defendants participated in the operation and management of Fenix, and conducted and participated, directly and indirectly, in the conduct of Fenix's business affairs. Because of their senior positions, they knew the adverse non-public information about Fenix's misstatement of revenue and profit and false financial statements.

61.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Fenix's financial condition and results of operations, and to correct promptly any public statements issued by Fenix which had become materially false or misleading.

62.      Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Fenix disseminated in the marketplace during the Class Period concerning Fenix's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Fenix to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Fenix within the meaning of Section

20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Fenix securities.

63.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Fenix.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 12, 2017                  Respectfully submitted,

                                         **THE ROSEN LAW FIRM, P.A.**

                                          /s/Laurence M. Rosen
                                         Laurence M. Rosen, Esq.
                                         609 W. South Orange Avenue, Suite 2P
                                         South Orange, NJ 07079
                                         Tel: (973) 313-1887
                                         Fax: (973) 833-0399

Email: lrosen@rosenlegal.com

Counsel for Plaintiff