**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BEEZLEY v. FENIX PARTS, INC., *et al.* | Case No. 1:17-cv-07896 |
| | Honorable Charles R. Norgle |

**DECLARATION OF EX KANO S. SAMS II AND ADAM M. APTON**
**IN SUPPORT OF: (I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF**
**CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND**
**(II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND**
**REIMBURSEMENT OF LITIGATION EXPENSES**

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 2

II.    PROSECUTION OF THE ACTION ................................................................... 6

     A.    Background ................................................................................................ 6

     B.    Commencement of the Instant Action and Appointment of Lead Plaintiffs and Lead Counsel ....................................................................... 10

     C.    The Comprehensive Pre-Filing Investigation and Preparation of the Complaint. 10

     D.    Defendants' Motions to Dismiss the Complaint and Plaintiffs' Response ........... 11

     E.    The Court's Order, Defendants' Answer, and Defendants' Motion for Reconsideration .................................................................................. 12

     F.    Fact Discovery ........................................................................................ 14

     G.    Class Certification, Mediation Efforts, Settlement Negotiations, and Preliminary Approval of the Settlement ............................................... 16

III.   THE RISKS OF CONTINUED LITIGATION ................................................. 18

     A.    Risks Faced in Obtaining and Maintaining Class Action Status ......................... 18

     B.    Risks to Proving Liability ....................................................................... 18

     C.    Risks to Proving Loss Causation and Damages................................................. 21

     D.    Other Risks.............................................................................................. 21

     E.    The Settlement is Reasonable in Light of Potential Recovery in the Action........ 23

IV.   PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE ................... 24

V.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT ......................... 25

VI.   LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES................................................ 28

     A.    The Outcome Achieved is the Result of the Significant Time and Labor that Lead Counsel Devoted to the Action................................................ 28

i

B.      The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases................................................ 30

C.      The Experience and Expertise of Lead Counsel, and the Standing and Caliber of Defendants' Counsel ............................................................................................. 32

D.      The Reaction of the Settlement Class Supports Lead Counsel's Fee Request ..... 32

E.      Plaintiffs Support Lead Counsel's Fee Request..................................................... 33

F.      Reimbursement of the Requested Litigation Expenses is Fair and Reasonable ... 33

VII.    CONCLUSION............................................................................................................. 35

**TABLE OF EXHIBITS TO DECLARATION**

| EX. | TITLE |
|---|---|
| 1 | Declaration of Jack Ewashko Regarding: (A) Mailing of the Postcard Notice; (B) Publication of Summary Notice: and (C) Report on Requests for Exclusion Received to Date |
| 2 | Declaration of Tom Weeks in Support of: (I) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 3 | Declaration of Douglas Barnard in Support of: (I) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 4 | Declaration of Keith White in Support of: (I) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 5 | Excerpts of Stefan Boettrich and Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review (NERA Jan. 29, 2019) |
| 6 | Declaration of Ex Kano S. Sams II in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Glancy Prongay & Murray LLP |
| 7 | Declaration of Adam M. Apton in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Levi & Korsinsky, LLP |
| 8 | Declaration of Phillip Kim, Esq. in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of The Rosen Law Firm, P.A. |
| 9 | Declaration of Peter S. Lubin in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Lubin Austermuehle, P.C. |
| 10 | Table of Law Firm Billing Rates |

| 11 | *In re Great Lakes Dredge & Dock*, No. 13-CV-02115, slip op. (N.D. Ill. Sep. 17, 2015) |
|----|------------------------------------------------------------------------------------------|
| 12 | *In re Acura Pharms., Inc. Sec. Litig.*, No. 10-CV-5757, slip op. (N.D. Ill. Mar. 14, 2012) |
| 13 | *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, No. 09 C 7666, slip op. (N.D. Ill. Jan. 22, 2014) |
| 14 | *In re Potash Antitrust Litig.*, No. 1:08-CV-6910, slip op. (N.D. Ill. June 12, 2013) |

We, Ex Kano S. Sams II and Adam M. Apton, declare under penalty of perjury, pursuant to 28 U.S.C. §1746, as follows:

1.     I, Ex Kano S. Sams II, am admitted *pro hac vice* in this Action.  I am a partner at Glancy Prongay & Murray LLP ("GPM"), co-counsel with Levi & Korsinsky, LLP ("L&K") (collectively, "Lead Counsel").  Lead Counsel served as counsel of record for Lead Plaintiffs Thomas Weeks, Douglas Barnard, and Keith B. White (collectively "Plaintiffs") in the above-captioned action (the "Action").[1]  I am familiar with the proceedings in this litigation, and I have personal knowledge of the matters set forth herein based upon supervising and participating in the Action.

2.     I, Adam M. Apton, am admitted *pro hac vice* in this Action.  I am a partner at L&K, and my firm served, in conjunction with GPM, as Lead Counsel for Plaintiffs in the Action.  I am familiar with the proceedings in this litigation, and I have personal knowledge of the matters set forth herein based upon supervising and participating in the Action.

3.     We respectfully submit this declaration, together with the attached exhibits, in support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and the concurrently-filed memorandum in support thereof (the "Final Approval Memorandum").  As set forth in the Final Approval Memorandum, Plaintiffs seek final approval of the $3,300,000 Settlement for the benefit of the Settlement Class, as well as final approval of the Proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members.

4.     We also respectfully submit this declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and the concurrently-filed memorandum in support thereof (the "Fee and Expense Memorandum").  As

---

[1]     Capitalized terms not otherwise defined herein have the meanings given to them in the Stipulation and Agreement of Settlement dated November 6, 2019 ("Stipulation") (ECF No. 131-1).

set forth in the Fee and Expense Memorandum, Lead Counsel seek an award of attorneys' fees in the amount of 33⅓% of the Settlement Fund (which by definition includes interest accrued thereon), and reimbursement of Litigation Expenses in the total amount of $170,640.35, which includes Lead Counsel's total expenses in the amount of $140,640.35 and $30,000 in total to Plaintiffs ($10,000 each) pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for their costs, including lost wages, incurred in connection with their representation of the Settlement Class.

5. The Court preliminarily approved the proposed Settlement by its Order dated November 26, 2019 (the "Preliminary Approval Order"), and thereby directed notice of the Settlement to be disseminated to the Settlement Class. *See* ECF No. 137. Pursuant to the Preliminary Approval Order, JND Legal Administration ("JND"), the Court-approved Claims Administrator, implemented a comprehensive notice program whereby notice was given to potential Settlement Class Members by mail and by publication.

6. In total, more than 10,000 Postcard Notices have been mailed to potential Settlement Class Members, and thus far not a single objection or request for exclusion have been received.

## I. INTRODUCTION

7. Plaintiffs in this action alleged claims pursuant to Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, against Defendants. (ECF No. 25). The class consists of all persons and entities who or which purchased or otherwise acquired the common stock of Fenix: (i) in Fenix's Initial Public Offering on May 14, 2015 ("IPO"); and/or (ii) on the public market between May 14, 2015 and June 27, 2017, inclusive ("Settlement Class Period"), and were allegedly damaged thereby. Plaintiffs alleged that Defendants made material misstatements and omissions regarding the Company's operations and financial condition. Specifically, Plaintiffs

alleged that Defendants made materially false and misleading statements and omissions concerning, among other things: (1) Fenix's inventory value; (2) Fenix's ability to acquire 10 to 15 companies within two years, one to three per quarter; (3) Fenix's goodwill value; and (4) Fenix's lack of internal controls. Plaintiffs further alleged that when Defendants disclosed the truth, Fenix's stock price plummeted, causing losses to investors.

8. The proposed Settlement presented to the Court for final approval provides the resolution of all claims in the Action in exchange for a cash payment of $3,300,000 (the "Settlement Amount") for the benefit of the Settlement Class. As detailed herein, Plaintiffs and Lead Counsel submit that the proposed Settlement represents an excellent result for the Settlement Class in light of the significant risks to overcome and remaining in the Action.

9. The $3,300,000 cash Settlement Amount is well within the range of reasonableness under the circumstances to warrant preliminary approval of the Settlement and the issuance of notice to the Settlement Class. Here, Plaintiffs' damages expert estimates that if Plaintiffs had fully prevailed at both summary judgment and after a jury trial, and if the Court and jury fully accepted Plaintiffs' damages theory, including proof of loss causation – *i.e.*, Plaintiffs' ***best-case scenario*** – the total ***maximum*** damages would be approximately $22 million. Thus, the $3.3 million Settlement Amount represents approximately 15% of the total ***maximum*** damages ***potentially*** available in this Action. In comparison, the median recovery in securities class actions in 2018 was approximately 2.6% of estimated damages. *See* Ex. 5 (Stefan Boettrich and Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review (NERA Jan. 29, 2019) at p. 36, Fig. 28.

10. Thus, the Settlement provides a substantial, certain, and immediate recovery, while avoiding the significant risks and expense of continued litigation, including the risk that the Settlement Class could recover less than the Settlement Amount (or nothing) after years of additional litigation and delay.

11. The Settlement was achieved after nearly three years of hard-fought litigation, during which Lead Counsel became well-informed of the relative strengths and weaknesses of

Plaintiffs' claims in the Action. In prosecuting the Action, Lead Counsel expended great efforts and resources on behalf of the Settlement Class. Indeed, among other things, Lead Counsel:

    a. reviewed and analyzed SEC filings, press releases, publicly-available documents, reports, announcements, news articles, investor conference call transcripts, analyst reports, and other public information regarding the Company and Defendants;

    b. worked with a damages and loss causation expert to analyze the Company's stock-price movement;

    c. retained and worked with a private investigator who conducted numerous interviews of former Company employees and other third parties;

    d. drafted the comprehensive, factually-detailed, 129-page Complaint incorporating the forgoing factual research and investigation;

    e. researched and drafted an omnibus opposition to Defendants' motion to dismiss;

    f. prepared for, attended, and participated in the status conference held by the Court on July 27, 2018;

    g. researched, briefed, and successfully opposed Defendants' motion for reconsideration;

    h. researched, briefed, and successfully opposed Defendants' motion for protective order;

    i. prepared and served numerous discovery requests and third-party subpoenas;

    j. reviewed and analyzed numerous documents produced by Defendants and third parties;

    k. researched and fully briefed the motion for class certification, which included an expert report on market efficiency;

    l. drafted a detailed mediation statement that set forth the facts of the case and analyzed the strengths and weaknesses of the Action and potential damages;

    m. drafted a comprehensive response to Defendants' mediation statement;

    n. engaged in a full-day mediation session overseen by an experienced and well-respected mediator, Michelle Yoshida, Esq., of Phillips ADR Enterprises;

    o. participated in several discussions after the mediation session to continue settlement negotiations;

    p. conducted time-intensive negotiations regarding the terms of the proposed Settlement;

4

        q.  drafted and then negotiated the Stipulation and related exhibits; and

        r.  drafted the preliminary approval and final approval briefs.

12.     Based on the foregoing efforts, Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents a favorable outcome for the Settlement Class and is in the best interests of the Settlement Class Members. For all the reasons set forth herein and in the accompanying memoranda and declarations, Plaintiffs and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Rule 23 (e) of the Federal Rules of Civil Procedure.

13.     In addition, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of one of Plaintiffs' damages consultants. The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts.

14.     Finally, Lead Counsel seeks approval of the request for attorneys' fees and reimbursement of Litigation Expenses as set forth in the Fee Memorandum. As discussed in detail in the accompanying Fee Memorandum, the requested 33⅓% fee is within the range of percentage awards granted by courts in this Circuit in comparable securities class actions. Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check, and is warranted in light of the extent and quality of the work performed and the substantial result achieved. Likewise, the requested litigation expenses of $140,640.35 and the requested PSLRA awards to Plaintiffs ($10,000 each) are also fair and reasonable. Accordingly, for the reasons set forth in the Fee Memorandum and for the additional reasons set forth herein, we respectfully submit that Lead Counsel's request for attorneys' fees and reimbursement of Litigation Expenses should be approved.

## II.     PROSECUTION OF THE ACTION

### A.     Background

15.     Fenix recycles and resells automotive products. (ECF No. 25, ¶28).  Fenix was created in January 2014 to merge eight different companies, consisting of 11 business entities (the "Founding Companies").  *Id*.  Through November 2014, Fenix entered into agreements with the owners of each of the Founding Companies to combine their businesses.  *Id*.  According to Fenix, the consideration to be paid to the owners of the Founding Companies was determined by arm's-length negotiations between Fenix and representatives of each Founding Company.  *Id*.

16.     Fenix, however, did not obtain independent valuations, appraisals, or fairness opinions to support the consideration that the Company agreed to pay for the Founding Companies.  *Id*., ¶29.  Instead, Fenix "relied on the experience and judgment of our management and our evaluation of the potential synergies that could be achieved in combining the operations of the Founding Companies."  *Id*.  Since Fenix disclosed that, at the time of the IPO, "Fenix has no operations at this time and has two employees," Fenix apparently relied purely on Chief Executive Officer ("CEO") Robertson and Chief Financial Officer ("CFO") Pettit to negotiate with the Founding Companies.  *Id*.  Since CEO Robertson and CFO Pettit were hired by the owners of the Founding Companies in order to start Fenix, the consideration was not determined by an arm's-length negotiation.  *Id*.

17.     To fund the acquisitions of the Founding Companies, Company officials decided to take Fenix public.  *Id*., ¶30.  Fenix indicated that the net proceeds from the sale of 12 million shares of the Company's common stock in the offering, after deducting underwriting discounts and commissions and expenses, would be approximately $88.2 million (approximately $101.6 million after the Underwriters exercised their option to purchase an additional 1,800,000 shares).  *Id*.  Fenix also stated that it intended to use the net proceeds from the IPO, plus up to $11.5 million of borrowings and letter of credit utilization under a credit facility to be entered into with BMO Harris Bank N.A. ("BMO Harris") ("Credit Facility"), to pay the approximately $93.2 million cash portion of the consideration for the Founding Companies.  *Id*.

6

18.     Accordingly, despite the fact that Fenix was a shell of a company with only two employees, Defendants took Fenix public on May 14, 2015. *Id.*, ¶31. Although Fenix wanted to go public at $10 per share, the Company was forced to price its IPO at $8 per share due to a lack of interest in Fenix stock. *Id.* As the IPO price was $8 per share, CEO Robertson was forced to transfer 98,846 shares of Fenix common stock, and CFO Pettit was forced to transfer 26,359 shares of common stock. *Id.* These transfers resulted in a loss to Robertson of $790,768 and to Pettit of $210,872. *Id.* Had CEO Robertson and CFO Pettit not misled investors, these losses would have been even larger. *Id.*

19.     To raise interest in the IPO, CEO Robertson and CFO Pettit misrepresented that in addition to the Founding Companies, Fenix would acquire an additional 10 to 15 companies in the next two years, consisting of one to three acquisitions per quarter. *Id.*, ¶34. Thus, Fenix acquired an additional three companies between August 18, 2015 and October 9, 2015 . *Id.*, ¶35. Fenix, did not, however, acquire a single company afterwards due to its lack of internal controls over inventory valuation and goodwill, violation of the Credit Facility's covenants, and inability to continue as a going concern. *Id.*

20.     Additionally, Fenix indicated within the Offering Documents that it evaluates its inventory valuation and goodwill impairment on an ongoing basis. *Id.*, ¶36. Fenix also stated within the Offering Documents that consolidated inventories consisted of $42,190,000 as of December 31, 2014. *Id.*, ¶37. However, over the next year, Defendants disclosed that those inventories were actually over ***$14.8 million less*** than they represented. *Id.* On Fenix's Form 10-K dated April 14, 2016, inventories from the Founding Companies was estimated at $41.177 million on June 30, 2015, and, by December 31, 2015, re-estimated downward to $38.110 million – a decrease of $4.08 million since the Company's IPO. *Id.* Fenix did not provide a reason for this write-down in its Form 10-K. *Id.* Fenix, moreover, reduced its value of inventory by an additional $7.3 million during the three months ending March 31, 2016, and by an additional $3.5 million during the three months ended June 30, 2016. ¶38. These reductions

resulted in a decrease in the value of Fenix's inventory of $14.88 million in under one year, and had a material impact on Fenix's goodwill and Credit Facility's borrowing base. *Id*.

21.     Fenix tested for goodwill impairment on an annual basis based upon a fair-value approach. *Id.*, ¶40. Fenix allegedly performed these goodwill impairment tests annually during the fourth quarter and between annual tests whenever events or circumstances indicated that an impairment may have existed. *Id.*, ¶41. Fenix was required to evaluate events and circumstances that may have affected the performance of the reporting unit, and the extent to which the events and circumstances may have impacted future cash flows. *Id*. However, as stated on February 21, 2017, Fenix did not have adequate internal controls "to prepare, document and review areas of significant judgments and accounting estimates, including purchase accounting, contingent consideration, potential goodwill impairment and inventory valuation." *Id*.

22.     As a result of its lack of adequate internal controls, decrease in inventory valuation, and increase in goodwill, Fenix was forced to take an impairment charge of $43.3 million just one year after the IPO. *Id.*, ¶42. This impairment charge also resulted in a violation of Fenix's Credit Facility. *Id*. Less than two weeks after the announcement of the impairment charge, Fenix announced that it had changed auditors on July 8, 2016 from BDO USA, LLP ("BDO") to Crowe Horwath LLP ("Crowe Horwath"). *Id*. Subsequently, the SEC began an investigation focused on the Company's change in its independent registered public accounting firm, its business combinations and goodwill impairment charge, the effectiveness of its internal control over financial reporting, and its inventory valuation methodology. *Id*.

23.     On April 22, 2015, Fenix entered into an agreement with BMO Harris for a proposed $35 million senior secured credit facility that was expressly contingent upon the completion of the IPO. *Id.*, ¶43. The Credit Agreement was imperative to Fenix's ability to continue as a going concern, since the completion of the IPO was likewise contingent upon the execution of the Credit Facility. *Id*. Without the Credit Facility, Fenix would not have been able to acquire 10 to 15 companies in the next two years (or one to three companies per quarter), or

8

continue as a going concern. *Id*. Fenix stated that proceeds from the Credit Facility would be used for capital expenditures, working capital, permitted acquisitions, general corporate purposes, and for certain fees and expenses associated with the closing of the Credit Facility and the IPO. *Id.*, ¶45. The term of the revolving credit facility and the term loan facility was for five years. *Id*. The Credit Facility was secured by a first-priority perfected security interest in substantially all of Fenix's and Fenix's domestic subsidiaries assets, specifically inventory. *Id.*, ¶46. The value of Fenix's inventory played a large role in Fenix's ability to withdraw under the Credit Facility. *Id*.

24. On April 4, 2016, Fenix announced an amendment to the Credit Facility dating back to December 31, 2015. *Id.*, ¶49. Under the amendment, Fenix was required to maintain a total leverage ratio of greater than 3.75 to 1 for the first quarter of 2016, 3.50 to 1 for quarters two through four of 2016, 3 to 1 for the first quarter of 2017, and for periods ending on or after June 30, 2017, 2.75 to 1. *Id*. Further, Fenix was required to generate positive adjusted Earnings Before Interest, Tax, Depreciation, and Amortization ("EBITDA") in order to increase its draw on its Credit Facility to consummate acquisitions. *Id*.

25. Throughout the Settlement Class Period, Defendants touted the Company's ability to borrow under the Credit Facility. *Id.*, ¶51. This ability was material to both Fenix and investors because of Fenix's corporate strategy to acquire one to three additional companies per quarter, and 10 to 15 additional companies over the first two years of operations. *Id*. To maintain the appearance that Fenix was operating in accordance with its business plan, Defendants continued to mislead investors regarding the Company's inventory valuation and goodwill amount to increase its borrowing power under the Credit Facility and stay in compliance with its financial covenants. *Id*.

26. Fenix, however, was eventually forced to disclose its true financial state to the market. *Id*. Indeed, Fenix announced on February 21, 2017, that it was in violation of the Credit Facility because of its failure to comply with the Credit Facility's financial covenants due primarily to: (1) lower asset values as a result of reductions during 2016 to the aggregate

estimated fair value of acquired inventory, which reduced the Company's borrowing base; (2) limits on certain non-cash adjustments (including goodwill) to calculate EBITDA for covenant compliance; and (3) lower than forecasted EBITDA during the third quarter of 2016 because of a decline of approximately 5% in quarterly net revenues and higher operating expenses, including significant accounting, legal and other fees primarily as a result of the transition to a new public accounting firm beginning in July 2016 and the previously-reported SEC inquiry. *Id.*, ¶52. Fenix also disclosed that as a result of this violation of the Credit Facility, substantial doubt existed regarding Fenix's ability to continue as a going concern. *Id.*, ¶53. In fact, just four months later, Fenix was delisted from NASDAQ. *Id.*

## B. Commencement of the Instant Action and Appointment of Lead Plaintiffs and Lead Counsel

27. This Action was commenced in the United States District Court for the District of New Jersey and was subsequently transferred to the United States District Court for the Northern District of Illinois on January 12, 2017.

28. On June 28, 2017, the Court appointed Thomas Weeks, Douglas Barnard, and Keith B. White as lead plaintiffs, appointed GPM and L&K as co-Lead Counsel, and Carella, Byrne, Cecchi, Olstein, Brody & Angello, P.C. ("Carella"), as liaison counsel.[2]

## C. The Comprehensive Pre-Filing Investigation and Preparation of the Complaint

29. Lead Counsel conducted an extensive and detailed pre-filing investigation of Plaintiffs' claims against Defendants, which included, among other things: (1) reviewing and analyzing the Company's public SEC filings, press releases, earnings calls, various industry conference presentations, and other public statements made by Defendants prior to, during, and after the Settlement Class Period; (2) researching, reviewing, and analyzing other publicly available documents, reports, announcement, news articles, and trade periodicals concerning the

---

[2] Carella performed a limited amount of work on the case before the action was transferred to the Northern District of Illinois. Lead Counsel intend to reimburse Carella for the *de minimis* work it performed from the requested fee award.

Company; (3) working with a finance expert to analyze price movements of the Company's securities and to evaluate issues related to market efficiency; (4) working with damages experts to analyze the losses attributable to the false and misleading statements alleged in the Action and other issues related to loss causation and damages; (5) retaining and working with a private investigator who conducted interviews with former Company employees and other relevant third parties; and (6) reviewing and analyzing court filings and other publicly available material related to the Company.

30.     On August 28, 2017, Plaintiffs filed the comprehensive, factually-detailed, 129-page Complaint.  ECF No. 25.  Plaintiffs alleged that Defendants made material misstatements and omissions regarding the Company's operations and financial condition.   Specifically, Plaintiffs alleged that Defendants made false and misleading statements and omissions concerning, among other things: (1) Fenix's inventory value; (2) Fenix's ability to acquire 10 to 15 companies within two years, one to three per quarter; (3) Fenix's goodwill value; and (4) Fenix's lack of internal controls.  The Complaint further alleged that the price of Fenix' common stock was artificially inflated as a result of Defendants' allegedly false and misleading statements and declined when the truth was revealed.

### D.     Defendants' Motions to Dismiss the Complaint and Plaintiffs' Response

31.     On January 2, 2018, Defendants filed their motion to dismiss Plaintiffs' Complaint.  ECF No. 64.  Among other things, Defendants argued that: (1) Plaintiffs' claim brought pursuant to the Securities Act was time-barred; (2) Plaintiffs' claims failed because Plaintiffs did not adequately plead a false or misleading statement of fact; (3) none of the alleged misrepresentations were actionable because they constituted immaterial or forward-looking statements that were protected by the safe harbor provision of the PSLRA; (4) Plaintiffs failed to adequately plead scienter for their claims brought pursuant to the Exchange Act; (5) Plaintiffs failed to adequately plead loss causation; and (6) Plaintiffs failed to adequately plead control-person liability pursuant to Section 20(a) of the Exchange Act and Section 15 of the Securities

Act.  The Underwriter Defendants also filed a motion to dismiss the Complaint and made many of the same arguments.  ECF No. 59.

32.     On March 5, 2018, Plaintiff filed and served an omnibus opposition to the motions to dismiss filed by Defendants and the Underwriter Defendants.  ECF No. 72.  In seeking to refute Defendants' motions to dismiss, Plaintiffs argued, among other things, that the alleged false statements and omissions were actionable, that Plaintiffs adequately pled that Defendants never disclosed the allegedly omitted information or adequately warned of the risks posed by Defendants' misrepresentations and omissions, that the Complaint's allegations raised a strong inference of scienter, that Plaintiffs adequately pled loss causation, and that Plaintiffs adequately alleged control person claims.  Plaintiffs also filed a comprehensive objection to Defendants' Request for Judicial Notice.  ECF No. 73.

33.     On April 4, 2018, Defendants and the Underwriter Defendants filed their replies in further support of the motions to dismiss.  ECF Nos. 74, 76.

### E.     The Court's Order, Defendants' Answer, and Defendants' Motion for Reconsideration

34.     On June 26, 2018, the Court dismissed the underwriter defendants BMO Capital Markets Corp., Stifel, Nicolaus & Company, Incorporated, BB&T Capital Markets, and Barrington Research Associates, Inc. from this Action (ECF No. 80), but on July 13, 2018, the Court denied in full the Motion to Dismiss filed by Defendants Fenix, CEO Robertson, and CFO Pettit.  ECF No. 82.

35.     On July 27, 2018, the Court held a status conference in the case with counsel for the parties.  ECF No. 84.  The Court discussed various matters with counsel in light of the rulings that the Court issued on Defendants' Motions to Dismiss, including Defendants' requests for a continued stay of discovery and for the bifurcation of discovery if discovery were to proceed.

36.     Upon receiving the Court's ruling on Defendants' Motion to Dismiss, Defendants filed a Motion for Reconsideration on August 20, 2018.  ECF No. 87.  Defendants' main

arguments were that the Court failed to address arguments raised by Defendants in their Motion to Dismiss, including whether Plaintiffs' Securities Act claims were time-barred, and whether Defendants' cautionary language was adequate pursuant to the safe harbor provision of the PSLRA.

37.     Additionally, Defendants filed a Motion for Protective Order in an attempt to prevent Plaintiffs from obtaining discovery during the pendency of their Motion for Reconsideration. ECF. No. 94.

38.     On September 10, 2018, Plaintiffs opposed Defendants' Motion for Reconsideration. ECF No. 96. In the opposition, Plaintiffs argued that the Court correctly denied Defendants' Motion to Dismiss and that Defendants were improperly rehashing arguments that the Court had previously considered and rejected. *Id*.

39.     On September 24, 2018, Defendants filed a reply in support of their Motion for Reconsideration. ECF No. 101. In their reply, Defendants reiterated their belief that the Court wrongly decided their Motion to Dismiss. *Id*.

40.     On September 28, 2018, Defendants filed their Answer to Plaintiffs' Complaint. ECF No. 102.

41.     On October 5, 2018, Plaintiffs opposed Defendants' Motion for a Protective order. ECF No. 103. Among other things, Plaintiffs argued that because the Court denied Defendants' Motion to Dismiss, discovery should proceed pursuant to the PSLRA. *Id*.

42.     On October 19, 2018, Defendants filed their reply in support of their Motion for Protective Order, arguing that the stay of discovery that existed during the briefing of Defendants' Motion to Dismiss should continue. ECF No. 103.

43.     On October 22, 2018, Plaintiffs filed a comprehensive supplement to Plaintiffs' Opposition to Defendants' Motion for Protective Order, and submitted 16 exhibits that Plaintiffs believed were relevant to the motion.

44.     On November 1, 2018, Magistrate Judge Cole denied Defendants' Motion for Protective Order.  ECF No. 108.  Magistrate Judge Cole also ruled that Defendants "have failed to establish 'good cause' for bifurcation of discovery."  *Id*.

45.     On February 13, 2019, the Court denied Defendants' Motion for Reconsideration in its entirety.  ECF No. 119.  The Court ruled that "Defendants fail to show the Court committed a manifest error of law by rejecting their relation-back argument in their motion to dismiss."  *Id*. Importantly, the Court held that it did, in fact, consider and reject Defendants' disclosure arguments and arguments based upon the safe harbor provision of the PSLRA.  Specifically, the Court held that "[w]hen the Court determined that, for purposes of a motion to dismiss, Plaintiff sufficiently alleged claims under § 11 of the Securities Act and § 10(b) of the Exchange Act, it implicitly denied Defendants' remaining arguments."  *Id*.

### F.     Fact Discovery

46.     With the automatic stay of discovery imposed by the PSLRA having been lifted following the denial of the motion to dismiss, the Parties began conducting fact discovery.

47.     Plaintiffs served discovery requests on Defendants on August 15, 2018. Defendants then moved for a protective order on September 6, 2018, requesting the Court to: (i) direct Plaintiffs to withdraw their Requests for Production, Interrogatories and Subpoenas; (ii) stay all discovery pending the Court's ruling on Defendants' Motion for Reconsideration; and (iii) upon commencement of discovery, limit discovery to the issues of class certification unless and until a class is certified.  Magistrate Judge Cole denied Defendants' motion in its entirety on November 1, 2018.  ECF No. 107.

48.     To protect against the disclosure of potentially sensitive personal or proprietary records, the Parties drafted a comprehensive protective order to govern the treatment of confidential evidence produced in this case.  The Parties negotiated the extent to which, and the conditions under which, confidential information could be shown to deponents, non-parties, and others not previously privy to such information.  The Parties were able to reach agreement on all of their respective areas of concern, and on November 9, 2018, filed a Joint Motion for Entry of

14

an Agreed Confidentiality Order.  ECF No. 110.  The Court entered the Order on November 15, 2018.  ECF Nos. 112, 113.

49.    Subsequently, Defendants produced approximately 77,000 pages of documents in discovery and the Parties began the process of negotiating search terms.  Lead Counsel uploaded these documents onto a database to manage the volume of documents produced.  Lead Counsel also maintained an e-discovery system which Lead Counsel used to identify and track relevant documents most likely to be used in depositions and at trial (whether by Plaintiffs or Defendants), identified relevant witnesses for deposition or additional discovery requests, and established procedures to identify additional documents and information that had not been produced.

50.    Attorneys and staff used search terms, date filters, custodian fields, and other metadata to analyze thousands of documents related to key issues in the case.  Throughout the document review process, Lead Counsel analyzed the information contained in the documents, determined the documents' relevance to the alleged claims, and located the evidence needed to conduct effective witness depositions, as well as to present relevant information at class certification, summary judgment, and trial, and to rebut Defendants' defenses.

51.    Lead Counsel also identified percipient individuals and entities for deposition testimony.  At the time the Parties reached an agreement to resolve the Action, Plaintiffs were in the process of scheduling depositions of numerous parties and witnesses, including many non-party depositions comprising of third-party witnesses, Fenix's four underwriters, Fenix's two accounting firms, and Fenix's 11 founding companies.  Lead Counsel, moreover, was prepared to notice additional depositions pending agreement on dates and locations.

52.    Because a significant amount of relevant information in this Action was in the possession, custody, or control of third parties, Plaintiffs also engaged in significant efforts to conduct discovery of information possessed by third parties.  For example, Plaintiffs prepared and served comprehensive subpoenas to the Underwriter Defendants, given that they were third parties after the Court's ruling on their Motion to Dismiss.  Lead Counsel was also in the process

of identifying other third parties who may have possessed documents and information relevant in the Action. Lead Counsel would have sought to obtain such documents and information through subpoenas and other means if the Parties had not agreed to the Settlement.

**G.  Class Certification, Mediation Efforts, Settlement Negotiations, and Preliminary Approval of the Settlement**

53.  Plaintiffs filed their Motion for Class Certification on February 15, 2019, together with the 56-page expert report of Dr. Adam Werner of Crowninshield Financial Research regarding market efficiency.  ECF No. 117.

54.  While the Parties were briefing Plaintiffs' Motion for Class Certification, the Parties agreed to try and settle the case through mediation.  After much discussion, the Parties agreed to participate in a private mediation and selected Ms. Yoshida to serve as the mediator.

55.  In order to fully devote their full attention to the mediation and the possibility of a settlement, the Parties agreed to stay the case.  On February 21, 2019, the Court agreed to stay the case, including discovery and briefing, until the mediation was concluded.  ECF Nos. 120, 122.

56.  In advance of the mediation session, Lead Counsel dedicated substantial efforts to preparing a persuasive evidentiary-based mediation statement setting forth the facts relevant to the underlying alleged fraud, analyzing applicable law, and distilling discovery that had been completed, citing to dozens of exhibits unearthed in discovery.  The Parties exchanged mediation statements.

57.  Lead Counsel also spent considerable time and effort preparing a response to Defendants' mediation statement.  Plaintiffs' response was similarly comprehensive and evidentiary-based, and included citations to numerous additional exhibits obtained in discovery that further supported Plaintiffs' claims.

58.  On May 21, 2019, Lead Counsel and Defendants' Counsel met with Ms. Yoshida, who presided over a full-day, in-person mediation session in Chicago, Illinois.  During the mediation session, the Parties engaged in full and frank discussions concerning the merits of this

Action, including, for example, the evidence presented to support Plaintiffs' claims.   This negotiation process enabled the Parties to meaningfully assess the relative strengths and weaknesses of their respective claims and defenses.   The session ended, however, without an agreement to settle.

59.   On May 22, 2019, the Parties advised the Court that although the mediation was unsuccessful, the Parties had made progress and requested an extension of time until May 31, 2019 to continue mediation discussions.  ECF No. 124.

60.   Following the mediation, Ms. Yoshida participated in further telephonic discussions with the Parties.   Ms. Yoshida requested additional information regarding specific issues relevant to the Action that she believed would be helpful for the continued negotiation process.  Lead Counsel then carefully analyzed information contained in documents produced in discovery, located the evidence relevant to the settlement discussions, and provided additional documents and information that were responsive to Ms. Yoshida's requests.

61.   On May 29, 2019, Ms. Yoshida issued a mediator's proposal to settle the Action for $3,300,000, which the Parties accepted on May 30, 2019.   Lead Counsel then began negotiating the essential non-monetary terms of the Settlement.

62.   After the Parties advised the Court of the proposed tentative settlement agreement, Magistrate Judge Cole struck the pending status conference and deemed all matters relating to the referral of the case to have been completed and returned the case to Judge Norgle. ECF No. 126.

63.   Following additional negotiations, the Parties exchanged multiple drafts of—and ultimately executed—the Stipulation dated November 6, 2019 (ECF No. 131-1).  On November 8, 2019, Plaintiffs submitted their Unopposed Motion for: (I) Preliminary Approval of Class Action Settlement; (II) Certification of the Settlement Class; and (III) Approval of Notice to the Settlement Class.  ECF Nos. 129-132.

## III.     THE RISKS OF CONTINUED LITIGATION

64.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $3,300,000.  As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount – or nothing at all – if the case were to proceed through additional litigation to a jury trial, followed by the inevitable appeals.  Prior to trial and a potentially litigated verdict, the most immediate risks faced by the Settlement Class related to class certification.  In opposing class certification, Defendants would have raised significant arguments that the Court should have denied class certification.   Additionally, Defendants would have raised substantial arguments with respect to liability, loss causation, and damages in this case.  Thus, there was no guarantee that Plaintiffs and the Settlement Class would later achieve any recovery, let alone one greater than $3,300,00.

### A.     Risks Faced in Obtaining and Maintaining Class Action Status

65.     At the time Settlement was reached, Plaintiff had filed their Motion for Class Certification and the parties were briefing class certification.  While Lead Counsel was confident that all of the Rule 23 requirements were met and that the Court would certify the proposed class, Defendants would have raised arguments challenging the propriety of class certification in their opposing papers.

66.     While Lead Counsel believed their class certification papers would have sufficiently rebutted any arguments raised by Defendants, if the Court had agreed with any or all of Defendants' arguments, the potential damages available to any certified class may have been drastically reduced or completely eliminated.

### B.     Risks to Proving Liability

67.     In addition to the major hurdle of obtaining class action status, Plaintiffs and Lead Counsel faced numerous additional risks at summary judgment and trial, including establishing Defendants' liability.  Defendants forcefully argued in their motion to dismiss – and undoubtedly would have continued to argue at summary judgment or at trial – that Plaintiffs would not have

been able to establish the elements of their claims under the Securities Act and the Exchange Act.

68.     For instance, among other things, Defendants argued that: (1) Plaintiffs' claim brought pursuant to the Securities Act was time-barred; (2) Plaintiffs' claims failed because Plaintiffs did not adequately plead a false or misleading statement of fact; (3) none of the alleged misrepresentations were actionable because they constituted immaterial or forward-looking statements that were protected by the safe harbor provision of the PSLRA; (4) Plaintiffs failed to adequately plead scienter for their claims brought pursuant to the Exchange Act; (5) Plaintiffs failed to adequately plead loss causation; and (6) Plaintiffs failed to adequately plead control-person liability pursuant to Section 20(a) of the Exchange Act and Section 15 of the Securities Act.

69.     Specifically, Defendants argued that allegations made in Plaintiffs' original complaint regarding a September 10, 2015 *Street Sweeper* article allegedly demonstrated that the article discussed some of the problems at Fenix, including its inadequate financial statements and lack of adequate inventory valuation methodologies.  Defendants then argued that the public was therefore well aware of the factual bases of these allegations at least 16 months before the January 2017 filing of the original complaint, and that Plaintiffs could have raised their Securities Act claims well over a year before January 2017.  The Court, moreover, dismissed the claims asserted by the Underwriter Defendants on the same statute-of-limitations grounds raised by Defendants, and Defendants would have continued to make this argument had the litigation continued.

70.     Defendants further contended that Plaintiffs would not have demonstrated falsity because: (1) Plaintiffs impermissibly attempted to plead their claims by hindsight; (2) Fenix's financial estimates and acquisition strategy were statements of opinion that were not actionable; (3) none of the alleged misrepresentations were actionable because they were all immaterial or forward-looking statements under the safe harbor provision of the PSLRA; and (3) Fenix

disclosed that its inventory and goodwill calculations were estimates and that it had material weaknesses in its internal controls.

71.     Additionally, Defendants argued that Plaintiffs would not have established scienter in the Action.  Defendants argued that Plaintiffs' scienter allegations merely amounted to: (1) vague claims from a confidential witness with no clear connection to management or the alleged fraudulent activity; (2) generic motive-and-opportunity allegations that apply to every corporation in the country; (3) speculation regarding the dismissal of the Company's independent auditor and changes to the composition of Fenix's audit committee; and (4) conclusory accusations of willfulness predicated upon management's certifications and an SEC investigation.  Defendants also argued that Plaintiffs could not demonstrate scienter because Plaintiffs failed to allege facts probative of scienter with respect to each Defendant and each alleged violation, *i.e.*, no admissions of wrongdoing, no suspicious stock sales, and Defendants' continued insistence that Settlement Class Period statements were made in good faith.

72.     Defendants also argued that Plaintiffs would not have been able to establish loss causation.  Defendants argued—and would have continued to argue—that: (1) the corrective disclosures alleged in the Complaint did not establish loss causation; (2) prior to the first alleged disclosure, Fenix's share price had lost almost a quarter of its value since the IPO; and (3) events caused the truth regarding the Company's financial condition to become generally known to the market before Plaintiffs' alleged losses.

73.     Although Plaintiffs believe they had strong arguments in response to each of these arguments, Defendants' contentions nevertheless posed significant risks to establishing liability had the litigation continued.  Indeed, despite believing that this Action is meritorious, Plaintiffs and Lead Counsel were well aware of the high hurdle they would have to surmount in order to successfully prove that Defendants violated the Securities Act and that Defendants acted with the requisite mental state to ultimately prove Defendants' liability under the Exchange Act.

**C.      Risks to Proving Loss Causation and Damages**

74.      Even assuming Plaintiffs overcame the above risks and successfully established Defendants' liability, Plaintiffs would have confronted considerable challenges in establishing loss causation and class-wide damages.

75.      As detailed above, Defendants would have raised arguments contesting class certification, which if accepted by the Court would have drastically reduced or eliminated the Settlement Class's potential recovery.  The arguments raised by the Parties regarding class certification would have rested, in large part, upon market efficiency, and both sides would have used experts to support their respective positions.

76.      Expert testimony can often rest on many assumptions, any of which risks being rejected by a jury.  A jury's reaction to such expert testimony is highly unpredictable, and Lead Counsel recognized that, in such a battle, there is the possibility that a jury could be swayed by Defendants' expert(s) and could find only a fraction of the amount of damages Plaintiffs contended were suffered by the Settlement Class.  Thus, the amount of damages that the Settlement Class would actually recover at trial, even if successful on liability issues, was uncertain.  Similarly, there was no assurance that all of Plaintiffs' key evidentiary documents and testimony relating to liability and damages would be admitted as evidence by the Court at trial.  These issues could have seriously affected Plaintiffs' ability to successfully prosecute the allegations in this case.

77.      In sum, had any of Defendants' loss causation and damages arguments been accepted at summary judgment or trial, they could have dramatically limited – if not eliminated – any potential recovery.

**D.      Other Risks**

78.      Another important fact that further illustrates the difficulty that Plaintiffs would have faced had litigation proceeded is that the Company announced that the SEC closed its investigation of Fenix on January 19, 2018.  This development potentially had ramifications for

Plaintiffs' theory of liability and potential recovery of damages. Indeed, Defendants would have argued that because the SEC closed its investigation, the risks that Plaintiffs alleged in the Complaint failed to materialize, therefore undermining Plaintiffs' theory of liability and eliminating any basis for the recovery of damages. While Plaintiffs believed they had viable responses to Defendants' arguments, there existed a very real possibility that if the Court or the jury were to accept Defendants' arguments regarding the impact of the SEC's closure of its investigation, Plaintiffs' theory of liability could have been weakened, and the recovery of damages could have been eviscerated.

79.     In addition to the pending class certification motion, Plaintiffs also would have had to have prevailed at several later stages of litigation, each of which would have presented significant risks in complex class actions such as this one. For example, Plaintiffs would have had to complete substantial additional discovery, including taking fact depositions and conducting all expert discovery, the costs of which are assuredly high and the fruits of which are highly uncertain. Plaintiffs further would have had to successfully navigate and prevail against Defendants' anticipated motion(s) for summary judgment, as well as at trial. Lead Counsel know from experience that despite the most vigorous and competent of efforts, attorneys' success in contingent litigation such as this case is never assured. In fact, GPM recently received a negative verdict following a six-week antitrust jury trial in the Northern District of California after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs. *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.).

80.     Even if Plaintiffs had prevailed at all of those stages, they would have had to succeed on any appeals that would have surely followed. This process could have extended for years and might have ultimately led to a smaller recovery – or no recovery at all. Indeed, even prevailing at trial would not have guaranteed a recovery larger than the $3,300,000 Settlement.

81.     Given these significant litigation risks, Plaintiffs and Lead Counsel believe that the Settlement represents an excellent result for the Settlement Class.

**E.     The Settlement is Reasonable in Light of Potential Recovery in the Action**

82.     In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages.  According to analyses prepared by Plaintiffs' consulting damages experts, the Settlement value, totaling $3,300,000 in cash, is well within the range of reasonableness under the circumstances to warrant final approval of the Settlement.  Here, Plaintiffs' damages expert estimates that if Plaintiffs had fully prevailed at both summary judgment and after a jury trial, and if the Court and jury fully accepted Plaintiffs' damages theory, including proof of loss causation – *i.e.*, Plaintiffs' ***best-case scenario*** – the total ***maximum*** damages would be approximately $22 million.  Thus, the $3.3 million Settlement Amount represents approximately 15% of the total ***maximum*** damages ***potentially*** available in this Action.  In comparison, the median recovery in securities class actions in 2018 was approximately 2.6% of estimated damages.  *See* Ex. 5 (Stefan Boettrich and Svetlana Starykh, Recent Trends in Securities Class Action Litigation:  2018 Full-Year Review (NERA Jan. 29, 2019) at p. 36, Fig. 28.

83.     Having evaluated the relative strengths and weaknesses of the Action in light of Defendants' arguments, and considering the very real risks presented by the significant hurdles of class certification, summary judgment, trial, and any eventual appeals that would have arisen, it is the informed judgment of Lead Counsel, based upon all of the proceedings to date and their extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

## IV.    PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE

84.    Pursuant to the Preliminary Approval Order, Lead Counsel and the Court-approved Claims Administrator, JND, implemented a comprehensive notice program whereby notice was given to potential Settlement Class Members by mail and publication.

85.    The Court-approved Notice disclosed, among other things, the following information to Settlement Class Members: (1) the Settlement Amount; (2) the Plan of Allocation; (3) that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund, plus interest, and expenses incurred in prosecuting the Action in an amount not to exceed $250,000, which could include an application for reimbursement to each Plaintiff for their costs and expenses, and that any Settlement Class Member could object to the requested fee and expenses; (4) a detailed explanation of the reasons for the Settlement; (5) that requests for exclusion from the Settlement must be filed no later than February 14, 2020; (6) that objections to the Settlement, the Plan of Allocation, or the Fee Motion and Memorandum must be filed no later than February 14, 2020; and (7) that the deadline for filing Proof of Claims is April 24, 2020.

86.    Pursuant to the Court-approved notice program, on December 26, 2019, JND mailed, by first-class mail, the Postcard Notice to the names and address of 1,015 record holders of Fenix common stock that were identified as potential Settlement Class Members.  In addition, JND maintains a proprietary database with names and addresses of the largest and most common banks, brokers, and other nominees (the "Record Holder Mailing Database").  At the time of the initial mailing, the Record Holder Database contained 4,095 mailing records.  On December 26, 2019, JND caused the Postcard Notice to be sent by First-Class Mail to 4.095 mailing records contained in the Record Holder Mailing Database.

87.    As of January 29, 2020, a total of 10,012 Postcard Notices had been sent to potential Settlement Class Members.   Among other things, the Postcard Notice directed

Settlement Class Members to the Settlement Website, www.FenixSecuritiesLitigation.com, in order to obtain additional information on the Settlement and how to file a claim.

88.     In this regard, JND posted the Notice and Claim Form, along with other important case-related documents, including the Stipulation of Settlement and the Preliminary Approval Order, online at www.FenixSecuritiesLitigation.com, which became operational on or about December 26, 2019.  All documents are downloadable, and Settlement Class Members have the option of submitting Claim Forms online.

89.     JND also caused the Summary Notice to be published once in *Investor's Business Daily* on January 6, 2020, and transmitted once over the *PR Newswire* on January 10, 2020.

90.     Beginning on or about December 23, 2019, a case-specific toll-free telephone number, 844-961-0322, was established with an interactive voice response system and live operators.  The automated attendant answers the calls and presents callers with a series of choices to respond to basic questions.  Callers requiring further help have the option to be transferred to a live operator during business hours.

91.     The Notice informed potential Settlement Class Members that the deadline to file objections to the Settlement, proposed Plan of Allocation and/or the Fee Motion and Memorandum, or to request exclusion from the Settlement Class is February 14, 2020.  To date, no requests for exclusion have been received.  Additionally, to date, no objections to the Settlement, the Plan of Allocation or the maximum amounts listed in the Notice that Lead Counsel would seek for an award of attorneys' fees and reimbursement of Litigation Expenses have been entered on this Court's dockets or have otherwise been received by Lead Counsel. Lead Counsel will file reply papers on February 28, 2020 that will address any additional requests for exclusion and any objections that may be received.

## V.     ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

92.     Pursuant to the Preliminary Approval Order (ECF No. 137), and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net

Settlement Fund (*i.e.*, the $3,300,000 Settlement Amount plus any and all interest earned thereon less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; and (iv) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information submitted online or postmarked no later than April 24, 2020. The Net Settlement Fund will be distributed among Authorized Claimants according to the proposed Plan of Allocation, as subject to approval by the Court.

93.     The proposed Plan of Allocation is detailed in the Notice. If approved, the Plan of Allocation will govern how the Net Settlement Fund will be distributed among Authorized Claimants. The Plan of Allocation's objective is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a result of the alleged fraud as opposed to losses caused by market or industry-wide factors or Company-specific factors unrelated to the alleged fraud. Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund based on his, her, or its total Recognized Loss Amount as compared to the total Recognized Loss Amounts of all Authorized Claimants.

94.     The Plan of Allocation, developed by one of Plaintiffs' consultants working in conjunction with Lead Counsel, is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act and reflects an assessment of the damages that Plaintiffs contend could have been recovered under the theories of liability and damages asserted in the Action. More specifically, the Plan of Allocation reflects, and is based on, Plaintiffs' allegation that the price of Fenix's common stock was artificially inflated during the period from May 15, 2015 and June 28, 2017, inclusive, due to Defendants' alleged materially false and misleading statements and omissions.

95.     The Plan of Allocation is based on the premise that the decreases in the price of Fenix common stock that followed the alleged corrective disclosures that occurred on October 12, 2016, March 28, 2017 and June 27, 2017 may be used to measure the alleged artificial inflation in the price of Fenix common stock prior to these disclosures.

26

96.     An individual Claimant's recovery under the Plan of Allocation will depend on a number of factors, including how many shares of Fenix common stock the Claimant purchased, acquired, or sold during the Settlement Class Period, when that Claimant bought, acquired, or sold the shares, and the number of valid claims filed by other Claimants.

97.     If a Claimant has an overall market gain with respect to his, her, or its overall transactions in Fenix common stock during the Settlement Class Period, or if the Claimant purchased shares during the Settlement Class Period, but did not hold any of those shares through at least one of the alleged corrective disclosures, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud.

98.     If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant.  Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized Claimants whose prorated payments are $10.00 or greater.  In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost prohibitive.

99.     In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund fairly among Settlement Class Members based on the losses they suffered on transactions in Fenix common stock that were attributable to the conduct alleged in the Complaint.  Plaintiffs and Lead Counsel believe that the proposed Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members similar to the result if Plaintiffs prevailed at trial.

100.    As noted above, as of January 29, 2020, more than 10,000 copies of the Postcard Notice have been disseminated to potential Settlement Class Members.  To date, no objections to the proposed Plan of Allocation have been received.

## VI.    LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

101.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying for a fee award of 33 ⅓% of the Settlement Fund (*i.e.*, $1,100,000 plus interest accrued thereon).   Lead Counsel also request reimbursement in the amount of $140,640.35 for expenses paid or incurred by Lead Counsel in connection with the prosecution and resolution of the Action – an amount that is well below the maximum expense amount of $250,000 set forth in the Settlement Notice.   Finally, Lead Counsel request awards of $10,000 to each Plaintiff for their costs, including lost wages, incurred in connection to their roles as Lead Plaintiffs and/or representative plaintiffs in the Action.

102.    As set forth in the accompanying Fee Memorandum, the requested 33⅓% award and the resulting multiplier on Lead Counsel's lodestar of approximately 1.03, are both well within the range of fee awards in other comparable class action settlements and are justified here in light of the extent and quality of Lead Counsel's work.   The legal authorities supporting the requested fees and expenses are set forth in the accompanying Fee Memorandum.   The primary factual bases for the requested fees and expenses are set forth below.

### A.    The Outcome Achieved is the Result of the Significant Time and Labor that Lead Counsel Devoted to the Action

103.    The work undertaken by Lead Counsel in investigating and prosecuting the Action and arriving at the present Settlement in the face of substantial risks has been time-consuming and challenging.   At all times throughout the pendency of the Action for a period of approximately three years, Lead Counsel's efforts were driven and focused on advancing the Action to bring about the most successful outcome for the Settlement Class, whether through settlement or trial.   As previously summarized above, among other things, Lead Counsel: (1) reviewed and analyzed SEC filings, press releases, publicly-available documents, reports, announcements, news articles, investor conference call transcripts, analyst reports, and other public information regarding the Company and Defendants; (2) worked with a damages and loss causation expert to analyze the Company's stock-price movement; (3) retained and worked with

28

a private investigator who conducted numerous interviews of former Company employees and other third parties; (4) drafted the comprehensive, factually-detailed, 129-page Complaint (ECF No. 25); (5) researched, drafted, and successfully opposed Defendants' motions to dismiss; (6) prepared for, attended, and participated in the status conference held by the Court on July 27, 2018; (7) researched, briefed, and successfully opposed Defendants' motion for reconsideration; (8) researched, briefed, and successfully opposed Defendants' motion for protective order; (9) prepared and served numerous discovery requests and third-party subpoenas; (10) reviewed and analyzed numerous documents produced by Defendants and third parties; (11) researched and fully briefed the motion for class certification, which included an expert report on market efficiency; (12) drafted a detailed mediation statement that set forth the facts of the case and analyzed the strengths and weaknesses of the Action and potential damages; (13) drafted a comprehensive response to Defendants' mediation statement; (14) engaged in a full-day mediation session overseen by an experienced and well-respected mediator, Michelle Yoshida, Esq., of Phillips ADR Enterprises; (15) participated in several discussions after the mediation session to continue settlement negotiations; (16) conducted time-intensive negotiations regarding the terms of the proposed Settlement; (17) drafted and then negotiated the Stipulation and related exhibits; and (18) drafted the preliminary approval and final approval briefs.

104. Moreover, Lead Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval. No additional compensation will be sought for this work.

105. As set forth in Exhibits 6-9, respectively, Plaintiffs' Counsel expended a combined 1,702 hours prosecuting this Action, for a collective total lodestar of $1,071,590.75, as reflected below:

| LAW FIRM: | LODESTAR |
|---|---|
| Glancy Prongay & Murray LLP | $520,989.75 |
| Levi & Korsinsky LLP | $508,018.75 |
| Rosen Law Firm, P.A. | $34,336.25 |
| Lubin Austermuehle, P.C. | $8,246.00 |

29

| | |
|---|---|
| **TOTAL LODESTAR** | **$1,071,590.75** |

106.     The hourly rates for the attorneys and professional support staff are similar to the rates that have been accepted in other securities or shareholder litigation in this District.  *See e.g.*, *Gupta v. Power Sols. Int'l, Inc.*, 2019 WL 2135914, at *2 (N.D. Ill. May 13, 2019.  Additionally, the rates billed by Lead Counsel (ranging from $395-$650 per hour for non-partners and $775-$975 per hour for partners and of counsel attorneys) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude.  *See* Ex. 10 attached hereto (table of peer firm billing rates).

107.     Based on the work performed and the quality of the results achieved, Lead Counsel respectfully submits that a 33⅓% fee is fully merited under the "percentage of the fund" methodology.  Furthermore, as set forth below, though not required in the Seventh Circuit, we also respectfully submit that the requested fee is fully supported by a "lodestar multiplier cross-check."

108.     The requested 33⅓% attorneys' fee (which equates to $1,100,000, plus interest at the rate earned by the Settlement Fund) represents a 1.03 lodestar multiple compared to the base lodestar value of Lead Counsel's time. As shown in Lead Counsel's accompanying Fee Memorandum, such a multiplier is below the range of multipliers that courts often award in comparably complex securities class actions.  Where (as here) the requested fee amounts to a 1.03 multiplier on Lead Counsel's total lodestar time, the lodestar cross-check fully supports the requested fee.

109.     These substantial efforts resulted directly in the significant Settlement obtained for the benefit of the Settlement Class and, accordingly, this factor weighs strongly in favor of the requested 33⅓% award of attorneys' fees.

> **B.     The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases**

110.     This prosecution was undertaken by Lead Counsel on a pure contingency-fee basis.  From the outset, Lead Counsel understood that they were embarking upon a complex,

expensive, and lengthy litigation with no guarantee of even being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and to cover the considerable litigation costs required by a case like this one.

111. With an average lag time of many years for complex cases like this case to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel received no compensation during the course of the Action and incurred $140,640.35 in litigation-related expenses in prosecuting the Action.

112. Lead Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever. Despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured. Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

113. Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 n.4 (2007) ("private securities litigation is an indispensable tool with which defrauded investors can recover their losses – a matter crucial to the integrity of domestic capital markets.") (internal quotation marks omitted). As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately

compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

### C.    The Experience and Expertise of Lead Counsel, and the Standing and Caliber of Defendants' Counsel

114.    As demonstrated by the firm resumes attached hereto, Lead Counsel have extensive and significant experience in the specialized area of securities litigation. Exs. 6-9. The attorneys who were principally responsible for leading the litigation have prosecuted securities claims throughout their careers, and have recovered hundreds of millions of dollars on behalf of investors. This experience allowed Lead Counsel to develop and implement litigation strategies to address the complex obstacles that are inherent in securities class actions and those specific to this case that were raised by Defendants. We believe that the recovery achieved here for the Settlement Class reflects the high quality of Lead Counsel's representation.

115.    Additionally, the quality of the work performed by Lead Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Katten Muchin Rosenman LLP, a renowned law firm that vigorously represented the interests of their clients throughout this Action. In the face of this experienced and formidable opposition, Lead Counsel was nonetheless able to persuade Defendants to settle the case on terms favorable to the Settlement Class.

### D.    The Reaction of the Settlement Class Supports Lead Counsel's Fee Request

116.    As noted above, as of January 29, 2020, over 10,000 Postcard Notices have been mailed advising Settlement Class Members of the Settlement in which Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund. In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted over the *PR Newswire*. To date, no objections to the attorneys' fees maximum set forth in the Notice have been received or entered on this Court's docket. Any objections received after the date of this filing will be addressed in Lead Counsel's reply papers to be filed on February 28, 2020.

117.    In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted the Action without any compensation or guarantee of success.  Based on the result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submit that a fee award of 33⅓%, resulting in a multiplier of 1.03, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

**E.    Plaintiffs Support Lead Counsel's Fee Request**

118.    As set forth in the declarations submitted by Lead Plaintiffs Thomas Weeks, Douglas Barnard, and Keith B. White, each of the Plaintiffs have concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action.  Exs. 2-4.  Lead Counsel have represented Plaintiffs throughout the litigation.  Plaintiffs have been intimately involved in this case since its earliest stages, and their endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

**F.    Reimbursement of the Requested Litigation Expenses is Fair and Reasonable**

119.    Lead Counsel seeks a total of $170,640.35 in Litigation Expenses to be paid from the Settlement Fund.  This amount includes $140,640.35 in expenses reasonably and necessarily incurred by Plaintiffs' Counsel in connection with commencing, litigating, and settling the claims asserted in the Action; as well as a total of $30,000 for the costs, including lost wages, and expenses incurred by Plaintiffs directly related to their representation of the Settlement Class.  We respectfully submit that the request for reimbursement of Litigation Expenses is appropriate, fair, and reasonable and should be approved in the amounts submitted herein.

120.    Lead Counsel are seeking reimbursement of a total of $140,640.35 in out-of-pocket costs and expenses on behalf of Plaintiffs' Counsel.  The following is a combined breakdown by category of all expenses incurred by Plaintiffs' Counsel:

| CATEGORY OF EXPENSE | AMOUNT |
|---|---|
| COURIER & SPECIAL POSTAGE | 970.70 |

| CATEGORY OF EXPENSE | AMOUNT |
|---|---:|
| COURT FILING FEES | 1,725.00 |
| DOCUMENT MANAGEMENT | 5,968.33 |
| EXPERTS | 90,160.00 |
| MEDIATION | 10,500.00 |
| ONLINE RESEARCH | 5,281.94 |
| INVESTIGATIONS | 5,060.00 |
| CONFERENCE CALL | 4.36 |
| PHOTOCOPYING/IMAGING | 65.95 |
| PRESS RELEASES AND NOTICE TO CLASS MEMBERS | 4,036.31 |
| SERVICE OF PROCESS | 527.00 |
| TRANSCRIPTS | 48.50 |
| TRAVEL AIRFARE | 9,107.25 |
| TRAVEL AUTO | 1,746.31 |
| TRAVEL HOTEL | 3,591.19 |
| TRAVEL MEALS | 647.51 |
| TRAVEL FINAL APPROVAL (ESTIMATE) | 1,200.00 |
| GRAND TOTAL | 140,640.35 |

121.    The Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of expenses in an amount not to exceed $250,000.  The total amount requested by Lead Counsel and Plaintiffs, $170,640.35, falls well below the $250,000 that Settlement Class Members were advised could be sought.  To date, no objections have been raised as to the maximum amount of expenses set forth in the Notice.  If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in their reply papers.

122.    From the inception of this Action, Lead Counsel were aware that they might not recover any of the expenses they incurred in prosecuting the claims against Defendants, and, at a minimum, would not recover any expenses until the Action was successfully resolved.  Lead Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would not compensate Lead Counsel for the lost use or opportunity costs of funds advanced to prosecute the claims against Defendants.  Thus, Lead Counsel were motivated to,

and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

123.    The largest component of expenses, $90,160.00, or approximately 64.1% of the total expenses, was expended on the retention of experts in the field of loss causation and damages.  The experts were consulted at different points throughout the litigation, including on matters related to the preparation of the amended complaint, market efficiency during class certification briefing, on matters relating to the negotiation of the Settlement, and on preparation of the proposed Plan of Allocation.

124.    Another large component of expenses, $10,500, or approximately 7.5% of the total expenses, was expended on Lead Counsel's share of mediation fees paid to Phillips ADR Enterprises for the services of Michelle Yoshida.

125.    The other Litigation Expenses for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These Litigation Expenses include, among others, costs of on-line legal and factual research, court fees, costs of out-of-town travel, copying costs, and postage and delivery expenses.

126.    Finally, Lead Plaintiffs Thomas Weeks, Douglas Barnard, and Keith B. White seek reimbursement of their reasonable costs and expenses incurred directly in connection with representing the Settlement Class in the amount of $10,000 each.  The amount of time and effort devoted to this Action by Plaintiffs is detailed in their accompanying declarations.  Exs. 2-4. Based on the substantial work done by Plaintiffs for the benefit of the Settlement Class, we believe that the Court should grant the Plaintiffs' request in full.

## VII.    CONCLUSION

127.    In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Memorandum, we respectfully submit that the Settlement should be approved as fair, reasonable, and adequate

and that the proposed Plan of Allocation should be approved as fair and reasonable. We further submit that the requested fee in the amount of 33⅓% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of total Litigation Expenses in the amount of $170,640.35 (which includes $30,000 for Plaintiffs' costs) should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct. Executed this 30th day of January, 2020, at Los Angeles, California.

*s/ Ex Kano S. Sams II*
EX KANO S. SAMS II

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct. Executed this 30th day of January, 2020, at Washington, D.C.

*s/ Adam M. Apton*
ADAM M. APTON

36

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the forgoing document to be filed on January 31, 2020, with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all attorneys appearing in this matter.

*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II